1    Christina Coates (State Bar No. 206602)
    ccoates@jonesday.com
2    Brian L. Johnson (State Bar No. 216604)
    bjohnson@jonesday.com
3    JONES DAY
    12265 El Camino Real
4    Suite 200
    San Diego, CA 92130
5    Telephone: 858.314.1200
    Facsimile: 858.314.1150

6

7    David R. Marshall (MN Bar No. 184457)
    S. Jamal Faleel (MN Bar No. 0320626)
    FREDRIKSON & BYRON, P.A.
8    200 South Sixth Street, Suite 4000
    Minneapolis, MN 55402-1425
9    Telephone: (612) 492-7000
    Facsimile: (612) 492-7077
10    *Pro Hac Vice Application Pending*

11    Attorneys for Defendant
    PETTERS CONSUMER BRANDS, LLC

12

13           UNITED STATES DISTRICT COURT

14          SOUTHERN DISTRICT OF CALIFORNIA

15

| 16 | STARLIGHT CONSUMER ELECTRONICS (USA), INC., (on its own behalf and on behalf of HANG SENG BANK) | **Case No. 3:07-cv-02102-IEG-RBB** |
|---|---|---|
| 17 | | **DECLARATION OF CHRISTINA D. COATES IN SUPPORT OF DEFENDANT'S MOTION FOR AN ORDER COMPELLING ARBITRATION AND EXHIBITS THERETO** |
| 18 | | |
| 19 | Plaintiff, | |
| 20 | v. | |
| 21 | PETTERS CONSUMER BRANDS, LLC, and DOES 1 through 100, | **[Filed concurrently with Notice of Motion and Motion For An Order Compelling Arbitration; Memorandum of Points and Authorities; and [Proposed] Order]** |
| 22 | Defendants. | |
| 23 | | |
| 24 | | **DATE: January 14, 2008** |
| 25 | | **TIME: 10:30 a.m.** |
| 26 | | **DEPT: Courtroom 1** |
| 27 | | **JUDGE: HON. IRMA E. GONZALEZ** |
| 28 | | |

LAI-2913850v1

1

2

3      I, Christina D. Coates, declare as follows:

4      I am an associate at the law firm of Jones Day and one of the attorneys

5  responsible for the defense of Defendant Petters Consumer Brands, LLC ("Petters")

6  in the above-captioned matter.  I submit this declaration in support of Defendants'

7  Motion For An Order Compelling Arbitration.  I have personal knowledge of the

8  facts set forth below and, if called to testify, I would and could competently testify

9  thereto.

10      2.      Attached hereto as Exhibit A is a true and correct copy of the original

11  complaint filed in Superior Court, County of San Diego, entitled *Starlight*

12  *Consumer Electronics (USA), Inc., (on its own behalf and on behalf of Hang Seng*

13  *Bank) v. Petters Consumer Brantds, LLC*, Case No. 37-2007-00075695-CU-BC-

14  CTL.

15      3.      Attached hereto as Exhibit B is a true and correct copy of the February

16  2005 Manufacturing Agreement between Petters and Starlite Consumer Electronics

17  (USA) Inc.  Paragraph 21 of the Agreement provides that "[a]ny controversy or

18  claim arising out of or relating to this Agreement shall be determined by arbitration

19  in accordance with the International Arbitration Rules…of the International Centre

20  for Dispute Resolution of the American Arbitration Association."

21

22      I declare under penalty of perjury under the laws of the state of California

23  that the foregoing is true and correct.

24      Executed this __7th__ day of November, 2007 at San Diego, California.

25

26      _____

27                          Christina D. Coates

28

ANTON N. HANDAL, ESQ     (SBN: 113812)
PAMELA C. CHALK, ESQ     (SBN: 216411)
GABRIEL G. HEDRICK, ESQ  (SBN: 220649)
HANDAL & ASSOCIATES
1200 THIRD AVE. SUITE 1321
SAN DIEGO, CA 92101
TEL. 619.544.6400
FAX. 619.696.0323

Attorneys for Plaintiff.

## SUPERIOR COURT OF CALIFORNIA

### IN AND FOR SAN DIEGO COUNTY

| | |
|---|---|
| STARLIGHT CONSUMER ELECTRONICS (USA), INC., (on its own behalf and on behalf of HANG SENG BANK) | Case No.: 37-2007-00075695-CU-BC-CTL |
| Plaintiff, | COMPLAINT FOR: |
| vs. | 1) BREACH OF CONTRACT; |
| PETTERS CONSUMER BRANDS, LLC, and DOES 1 through 100. | 2) BEACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; |
| Defendants | 3) CONSTRUCTIVE FRAUD; |
| | 4) FRAUD: INTENTIONAL MISREPRESENTATION OR SUPPRESSION OF MATERIAL FACT |
| | 5) FRAUD AND DECEIT: PROMISE MADE WITHOUT INTENTION TO PERFORM; |
| | 6) ACCOUNT STATED; |
| | 7) OPEN BOOK ACCOUNT |

COMES NOW PLAINTIFF, STARLIGHT CONSUMER ELECTRONICS (USA), INC., and files the instant action against PETTERS CONSUMER BRANDS, LLC and DOES 1 through 100 inclusive as follows:

### FACTS COMMON TO ALL COUNTS

1.      Plaintiff, STARLIGHT CONSUMER ELECTRONICS (USA), INC (hereafter "Starlight) is a Hong Kong registered company actively engaged in the business of

manufacturing consumer audio products for sale to United States and California based customers. Hang Seng Bank Limited ("Hang Seng Bank" or "Hang Seng") has authorized Starlight to pursue any and all claims it may have in this matter and/or to pursue a collection matter on its behalf in this case against any and all Defendants to include but not limited to Petters. (See attached Exhibit A).

2.      Defendant, PETTERS CONSUMER BRANDS, LLC (hereafter "Petters") is a Minnesota Corporation duly qualified to and actively doing business. Petters is best known in the consumer electronics industry by its brand name: Polaroid. In 2005, Petters acquired the Polaroid brand and assets from a trustee in Bankruptcy. Since then it has sourced goods from Asia for the Polaroid Brand – making promises to Asian manufacturers of millions of dollars of business. Petters also world renown for such household brand names as Sunbeam®, Oster®, and Emerson®. Petters' products are sold, marketed, and advertised throughout the United States to include but not limited to the State of California, County of San Diego, City of San Diego.

3.      Upon information and belief and thereupon alleged, Petters maintains one or more business addresses in the State of California to include but not limited to an address located at 6565 Knott Avenue, Buena Park, California. (See attached Exhibits B). Since on or before January 17, 2003, Petters has and continues to maintain a Sales and Use Tax Permit in the State of California, Permit Number 100600109. A copy of the Sales and Use Tax Permit verification is attached hereto as Exhibit B.

4.      At the present time, Plaintiff does not know the true names and capacities of the defendants sued herein as Does 1 through 100, and therefore sue these defendants by such fictitious names. Plaintiff will seek leave of court to amend this complaint to aver their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants, including the fictitiously named defendants was the duly authorized agent of each of the other defendants, and in doing the things herein mentioned, defendants, and each of them were acting within the course and scope of their agency and employment and that all acts, omissions, breaches, defaults, negligence, or other misconducts

as alleged in this Complaint were committed with knowledge, permission and consent of the other Defendants, and in doing the things herein mentioned, Defendants, and each of them, were acting with the course and scope of their agency and employment and that all acts, omissions, breaches, defaults, negligence or other misconduct as alleged in this Complaint were committed with knowledge, permission, and consent of the other defendants or were subsequently ratified by them, including fictitiously named defendants and each of them.

5.    Upon information and belief, each fictitiously named defendant is in some manner responsible for the occurrences alleged in this complaint and proximately caused the damages as alleged herein.

6.    Upon information and belief, at all times herein mentioned, each defendant acted individually and/or as the successor, agent, co-conspirator, aider, abettor, joint venturer, alter ego, third-party beneficiary, employee, officer, director or representative of the other defendants and, in doing the things hereinafter alleged, acted within the course and scope of such agency, employment or conspiracy and with the consent, permission and authorization of each of the remaining defendants. Upon information and belief, all actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers, directors or managing agents. Defendants' actions stemmed from an evil motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from defendants.

7.    Whenever and wherever reference is made in this Complaint to any act or failure to act by a Defendant or Defendants, such allegations and reference shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly, and severally.

8.    All of the acts and conduct herein below described of each and every Defendant was duly authorized, ordered, and directed by the respective and collective Defendant employers, and the officers and management level employees of said government employer. In addition thereto, said employers participated in the aforementioned acts and conduct of its said employees, agents, and representatives and each of them; and upon

completion of the aforesaid acts and conduct of said employees, agents and representatives, the Defendants respectively and collectively, ratified, accepted the benefits of, condoned, lauded, acquiesced, authorized and otherwise approved of each and all of the said acts and conduct of the aforementioned corporate employees, agents and representatives.

### FACTS COMMON TO ALL COUNTS

9.      In or about January of 2005, Petters approached Starlight Consumer Electronics (USA), Inc. for the purpose of sourcing consumer electronics products for sale to its customers in the United States under the Polaroid brand. Starlight is a subsidiary of Starlight Holdings, Ltd. The Starlight group of companies is publicly listed on The Stock Exchange of Hong Kong Limited under stock code 485.

10.      The Starlight group's business is the manufacture and export of consumer electronics products including, CD players, Boom-Boxes, Televisions, etc. Petters, however, asked for credit terms from Starlight. Specifically, Petters wanted Starlight to accept its Purchase Orders and agree to accept payment 60 days after delivery of the goods. These are typically referred to net terms. Starlight refused to sell goods to Petters under such terms and suggested that if its bank, Hang Seng Bank, would approve Petters under a factoring arrangement, it would agree to sell products to Petters.

11.      On or about June 25, 2005, Hang Seng Bank , considering the strength of the Polaroid brand name, agreed to factor the Petters' account. Hang Seng's agreement is embodied in a written Factoring Services Agreement ("Factoring Service Agreement" or "Factoring Agreement") between it and Starlight which provided in pertinent part that Hang Seng would advance money to Starlight against future Petters payments. A copy of this agreement is attached hereto as Exhibit C.

12.      Petters was the intended beneficiary under the terms of the Factoring Agreement. The Factoring Agreement essentially provided a mechanism for financing Petters' purchases of goods from Starlight.

13.     Petters knew of the arrangements for the Factoring Agreement and encouraged Starlight and Hang Seng Bank to create this financing vehicle for its sole and exclusive benefit.

14.     On June 28, 2005 Starlight advised Petters in writing of the creation of the factoring arrangement between it and Hang Seng Bank. By letter, Starlight specifically advised Petters that all invoices issued by Starlight in connection with product purchases were assigned to Hang Seng Bank for payment.

15.     Consistent with the terms of the factoring agreement, Petters placed Purchase Orders with Starlight. Starlight would, in turn, tender the Purchase Orders to Hang Seng Bank which would then advance to Starlight the value of the Petters Purchase Order less interest costs and expenses. Starlight would utilize these credit advances to purchase supplies and inventory which was utilized in connection with fulfilling Petters' Purchase Orders.

16.     Once the Purchase Orders were filled, Starlight shipped the goods directly to Petters' customers - as directed by Petters, which included shipments to Circuit City's facilities in California for ultimate sale and distribution by Circuit City stores throughout California to include but not limited to those in the County of San Diego, City of San Diego. (See attached Exhibit D).

17.     Consistent with the understanding of the parties, Starlight would then issue Invoices to Petters. An example of such an invoice is attached hereto as Exhibit E. Each invoice was specifically and prominently assigned in writing to Hang Seng Bank pursuant to the terms of the Factoring Agreement. Petters acknowledged that Hang Seng Bank had already paid Starlight and, thus, would directly pay such invoices in the normal course to Hang Seng Bank – not Starlight. Hang Seng Bank, pursuant to the agreement reached, accepted these payments and credited Petters' account accordingly.

18.     In or about July 2006, Petters began to fall behind on its payments to Hang Seng Bank. As of August 1, 2006, Petters had failed to make payment on $1,370,097 worth of invoices for goods which had been shipped to Petters customers, including Circuit City in California. A copy of the account stated/open account is attached hereto as Exhibit F.

19.     Hang Seng Bank made numerous demands on Petters to make good on the above described open account to no avail. Demand letters have gone unanswered and Petters refuses to offer an explanation for its refusal to make payment.

20.     Hang Seng Bank, thereupon, pursuant to the terms and conditions of the Factoring Agreement, made demand on Starlight to fulfill Petters' open balance and has authorized Starlight to pursue collection of said invoices on its behalf as the real party in interest. Starlight has thus received authority from Hang Seng Bank to take any and all collection actions necessary to collect outstanding balances due. (See attached Exhibit A).

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against All Defendants to include Does 1-100)

21.     Plaintiff repeats and re-alleges paragraphs 1- 20, inclusive as though fully set forth herein.

22.     Plaintiff and Hang Seng entered into one or more oral and/or written Agreements with Defendants and each of them for the financing of commercial transactions. The agreements are stated in the Purchase Orders, Invoices, emails and the accounting and book keeping systems of Hang Seng Bank.

23.     These contracts involve Petters' agreement to pay Hang Seng Bank for advances made by Hang Seng Bank on its behalf to its supplier, Starlight. In general, Hang Seng Bank agreed to Factor Petters' Purchase Orders opened to Starlight in exchange for Petters' agreement that it would repay Hang Seng Bank within sixty days of the issuance of the invoice for the goods.

24.     Petters knew of, acknowledged, and agreed to the terms of this arrangement by virtue of its conduct in accepting the advances made by Hang Seng Bank in connection with its Purchase Orders and also by making payment directly to Hang Seng Bank for some but not all of the advances made.

25.     Hang Seng Bank and Starlight performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of

the Agreements.

26.    Because of its wrongful conduct, as more fully described herein, Petters has breached their Agreements with Hang Seng Bank by purchasing goods on credit and refusing to pay for them.

27.    As of the date of this complaint, Petters has failed to pay Hang Seng Bank a total of $1,370,097.00 representing credit extensions made by Hang Seng Bank on Petters behalf.

## SECOND CAUSE OF ACTION:

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants to include Does 1-100)

28.    Plaintiff repeats and re-alleges paragraphs 1 -27, inclusive as though fully set forth herein.

29.    Hang Seng Bank and Starlight entered into the aforementioned oral and/or written Agreement(s) with Petters in good faith. They have performed all the duties and conditions of the Agreement(s) required of them in connection with their dealings with Petters.

30.    Petters knew that Hang Seng Bank and Starlight had fulfilled all their duties and fulfilled any conditions required of them under the oral and/or written contract(s) described herein. Notwithstanding such good faith performances, Petters breached the implied covenant of good faith and fair dealing by continuing to order goods and receive shipments without making any arrangement to pay for them.

31.    As the proximate result of the acts alleged above, the Plaintiff has and will suffer damages in an amount according to proof at trial but no less than $1,370,097.00.

## THIRD CAUSE OF ACTION:

## CONSTRUCTIVE FRAUD

### (Against All Defendants to include Does 1-100)

32.    Plaintiff repeat and re-allege paragraphs 1- 31, inclusive as though fully set forth herein.

33.    By virtue of the relationship that existed between Petters and Hang Seng

Bank, and by virtue of Hang Seng Bank having placed confidence in the fidelity and integrity of the Defendants, Hang Seng Bank and Starlight entrusted Petters with the responsibility to manage and honor its credit commitments including those under the Factoring Agreement.

34.    Despite having voluntarily accepted their trust and confidence, Petters abused that trust and confidence for personal gain by taking goods on credit terms and willfully refusing and failing to make payment therefor in breach of the trust and in violation of the agreements existing between them.

35.    Petters held itself out to the public and to the Plaintiff as a reputable, experienced distributor. It also made representations to the Plaintiff concerning its repayment history with other suppliers as well as its financial strength and good payment record. Plaintiff reasonably relied on Petters misrepresentations and caused its bank, Hang Seng Bank to establish credit for Petters.

36.    Petters, however, never intended to honor its promises and commitments as herein alleged and made such misrepresentations with the intent to deceive and defraud the Plaintiff. As a result of the acts of the Defendants, the Plaintiff has been damaged in an amount according to proof at trial but no less than $1,370,097.00.

37.    By failing to make payments on its credit advances, Starlight was required to make payment to Hang Seng Bank on Petters behalf in the amount of $1,370,097.00 and is therefore damaged is at least said amount.

38.    In doing the acts herein alleged, Petters has acted with oppression, fraud, breach of trust and malice and the Plaintiff is entitled to exemplary damages according to proof at trial.

### FOURTH CAUSE OF ACTION:

### FRAUD AND DECEIT: INTENTIONAL MISREPRESENTATION

### OR SUPPRESSION OF MATERIAL FACT

(Against All Defendants to include Does 1-100)

39.    Plaintiff repeats and re-alleges paragraphs 1-38, inclusive as though fully set forth herein.

40.    At all times alleged herein, Petters held itself out to the public and to the Plaintiff and/or Hang Seng as being competent, experienced distributors. Petters specifically represented to Hang Seng, Bank and Plaintiff that it would honor its financing commitments. Defendant, by and through its authorized representatives represented that if Hang Seng Bank and Starlight would agree to 60 day net terms for payment, it would make timely payment to Hang Seng Bank under its factoring agreement.

41.    Based on these representations, Plaintiff agreed to extend Petters credit under a factoring agreement with respect to U.S. based sales activities. The representations of the Petters, however, were in fact false. Petters, in fact, never intended on making payment under the factoring agreement but instead made the aforementioned misrepresentations to cause Hang Seng Bank to advance money on Petters' behalf without any intention of meeting its invoice obligations.

42.    Unknown to Plaintiff, Petters has a history of not making its payments to suppliers in Asia. Had Plaintiff known these facts, or had Petters disclosed that it routinely does not pay its Asian vendors, neither Plaintiff nor Hang Seng would have agreed to factor its account.

43.    At the time these representations were made by Petters and at the time the Plaintiff took the actions herein alleged, it was ignorant of the falsity of Petters' representations and believed them to be true.

44.    Had the Plaintiff known the actual facts, it would not have taken such action. The Plaintiff's reliance on Petters' representations was justified because the Petters held itself out to the public and to Plaintiff as being competent, experienced sales agents and distributors who honored its commitments and/or as a reputable business in the community.

45.    As a direct and proximate result of the Petters' conduct, Plaintiff has been deprived of over $1,370,097.00 in invoice payments it was reasonably entitled to receive.

46.    The aforementioned conduct of Petters amounts to an intentional misrepresentation, deceit, or concealment of material facts known to the Petters with the intention on the part of Petters of thereby depriving the Plaintiff of property or legal rights or

otherwise causing injury, and was despicable conduct that subjected the Plaintiff to cruel and
unjust hardships in conscious disregard of the Plaintiff's rights, so as to justify an award of
exemplary and punitive damages.

## FIFTH CAUSE OF ACTION:

## FRAUD AND DECEIT: PROMISE MADE WITHOUT INTENTION TO PERFORM

### (Against All Defendants to include Does 1-100)

47.     Plaintiff repeats and re-alleges paragraphs 1-46, inclusive as though fully set
forth herein.

48.     Petters made material promises to the Plaintiff that it would honor
credit/factoring commitments in connection with its dealings with Hand Seng Bank and
Starlight.

49.     At the time the aforementioned promises were made by the Petters, it had no
intention of performing.

50.     At the time the aforementioned promises were made, and at the time the
Plaintiff took the actions herein alleged, the Plaintiff was ignorant of the Petters' secret
intentions not to perform, believed its promises and could not in the exercise of reasonable
diligence have discovered the secret intentions of Petters not to fulfill the promises it made as
alleged herein.

51.     Had the Plaintiff known the actual facts, it would not have taken such action.
The Plaintiff's reliance on Petters' representations was justified because the Defendant held
itself out to the public and to Plaintiff as being competent, experienced sales agents and
representatives who would honor its commitments and/or was a reputable business in the
community.

52.     The aforementioned conduct of Petters amounts to an intentional
misrepresentation, deceit, or concealment of a material fact known to the Petters with the
intention on the part of Petters of thereby depriving the Plaintiff of property or legal rights or
otherwise causing injury, and was despicable conduct that subjected the Plaintiff to cruel and
unjust hardships in conscious disregard of the Plaintiff's rights, so as to justify an award of

exemplary and punitive damages.

2

## SIXTH CAUSE OF ACTION:

3

### ACCOUNT STATED

4

#### (Against All Defendants to include Does 1-100)

5      53.      Plaintiff repeats and re-alleges paragraphs 1-52 inclusive as though fully set

6   forth herein.

7      54.      As stated more fully above, Defendants and each of them promised Hang

8   Seng and Plaintiff that they would pay the invoices issued by Plaintiff in an amount of

9   $1,370,097.00 or more. As such, an account was stated between Petters and Hang Seng Bank

10   and/or Starlight. (See attached Exhibit F).

11      55.      At the time of the statement of account, Defendants and each of them

12   agreed to pay the amount stated, but have failed and/or refused to pay that amount or any part

13   of it.

14      56.      Plaintiff and Hang Seng have been damaged as a result. Hang Seng, as

15   alleged previously, authorized Plaintiff to sue on its behalf to pursue the account which has not

16   been paid by Defendants and each of them. Plaintiff, on behalf of Hang Seng, is thereby

17   entitled to a total sum in the amount of $1,370,097.00 or more plus interest.

18   ## SEVENTH CAUSE OF ACTION:

19   ### ACCOUNT STATED

20   #### (Against All Defendants to include Does 1-100)

21      57.      Plaintiff repeats and re-alleges paragraphs 1-56 inclusive as though fully set

22   forth herein.

23      58.      As stated more fully above, Defendants and each of them promised Hang

24   Seng that they would pay the invoices issued by Plaintiff in an amount of $1,370,097.00 or

25   more. As such, an account was stated between Petters and Hang Seng Bank and/or Starlight.

26      59.      As stated more fully above, Petters and Hang Seng had one or more financial

27   transactions as alleged more fully above.

28      60.      Hang Seng kept an account of the debits and credits involved in said

financial transactions. (See attached Exhibit F).

2        51.    Petters owes Hang Seng money on the account.

3        52.    The amount of money that Defendants and each of them owe Hang Seng is

4  $1,370,397.00 or more according to proof at trial.

5
### PRAYER FOR RELIEF

6  WHEREFORE, Plaintiff pray for judgment on its complaint as follows:

7       (1)    Compensatory damages;

8       (2)    General damages according to Proof;

9       (3)    Special damages according to Proof;

10      (4)    Consequential damages;

11      (5)    Attorney's fees and costs of the suit herein;

12      (6)    Interest at the legal rate;

13      (7)    All other relief as the Court may deem just and proper.

14                       HANDAL & ASSOCIATES

15

Dated:  September 26, 2007

16                          Anton Handal, Esq.

# EXHIBIT A

恒生銀行
HANG SENG BANK

理財創富 事事為你
Managing wealth for you, with you.

Starlite Consumer Electronics (USA), Inc.
5/F Shing Dao Industrial Bldg
232 Aberdeen Main Road
Aberdeen, Hong Kong
Attn: Mr Norman Chan

4 June 2007

Dear Sirs

**Factoring Agreement dated 8th July 2005 made between Hang Seng Bank Limited and Starlite Consumer Electronics (USA), Inc.**

We consent to your Company taking action (including taking legal proceedings, whenever necessary) in your name against Petters Consumer Brands, LLC ("Petters") to recover all sums outstanding under the invoices, heretofore assigned to us, (as referred to the Schedule below) together with all accrued interest and other legally permissible expenses (the "Legal Action"), conditional upon and subject to the following:

(1)    Your Company shall be solely responsible for conducting the Legal Action including the production of evidence at your Company's own cost and risk (subject to the paragraphs below);

(2)    You shall not call us or any of our officers or staff as any witness or require us or any of our officers or staff to attend any hearing in the Legal Action or to be involved in any way in the Legal Action without our prior agreement;

(3)    Your Company shall keep us informed of all the developments in the Legal Action, and shall immediately provide us such information upon our request;

(4)    Your Company shall at all times observe and comply with the terms and conditions of the Factoring Agreement and nothing in this letter shall prejudice our rights and powers under the Factoring Agreement;

(5)    All costs (including legal costs), charges and expenses incurred or payable by your Company in the Legal Action shall be borne and paid by your Company;

(6)    Any and all sums of monies recovered by your Company from Petters shall immediately be paid by your Company to our designated account number and before such payment be held by your Company on trust for our Bank;

(7)    Your Company shall communicate all settlement offers made or received to us for our consideration and agreement before taking any action on them;

(8)    Your Company shall agree to fully indemnify our Bank, our officers and employees against all liabilities, claims, suits, actions, proceedings, demand, penalties, losses, damages, taxes, costs,

恒生銀行有限公司 Hang Seng Bank Limited
香港九龍觀塘道33號國際貿易中心.
Hang Seng Tower Telford Plaza 33 Wai Yip Street Kowloon Bay HK
電話 Tel (852) 2198 1111  圖文傳真 Fax (852) 2868 4047
電傳 Telex 73511 HASEB HX   網址 Website www.hangseng.com



香港國際標準 ISO 14001 certified
全球最認可之環境管理系統標準
The world's most recognised standard for environmental management systems

charges and expenses of any kind (including, without limitation, legal fees on a full indemnity basis) of any kind which may be incurred or suffered or liable by our Bank or any of them and all actions or proceedings which may be brought by or against our Bank or any of our officers or staff arising from and/or in connection with the Legal Action and/or enforcing or exercising any power or right under the Factoring Agreement and/or the Legal Action and/or this letter and/or any related arrangement; and

(9)  The no-objection given in this letter is revocable upon our giving 3 days prior notice or such shorter period as we deem fit.

<u>Schedule</u>

Payment Term:  Net 60 days

| Shipment Date | Inv. No. | Amount US$ | Due Date | Remarks |
|---|---|---|---|---|
| 04-24-06 | SCE-06-059 | 152,233.00 | 06-23-06 | |
| 04-24-06 | SCE-06-060 | 304,466.00 | 06-23-06 | |
| 05-04-06 | SCE-06-066 | 152,233.00 | 07-03-06 | |
| 05-04-06 | SCE-06-067 | 152,233.00 | 07-03-06 | |
| 05-08-06 | SCE-06-071 | 152,233.00 | 07-07-06 | |
| 05-15-06 | SCE-06-079 | 152,233.00 | 07-14-06 | |
| 05-22-06 | SCE-06-098 | 152,233.00 | 07-21-06 | |
| 05-29-06 | SCE-06-0113 | 152,233.00 | 07-28-06 | |
| Total Outstanding Amount: | | 1,370,097.00 | | |

Please acknowledge your agreement to the above terms and conditions by signing and returning to us a copy of this letter.

Yours faithfully

Edmond Lee

Senior Vice President Department Head

Customized Trade Solutions Department

Commercial Banking

Hang Seng Bank Limited

恒生銀行有限公司 Hang Seng Bank Limited

EXHIBIT B

Sales and Use Tax Permit Verification - Board of Equalization          https://efile.boe.ca.gov/boewebservices/verification_results.jsp

HOME    HELP CENTER    SITE MAP    EN ESPAÑOL                              SEARCH

Sales and Use Tax Permit Verification

**Permit Number 100600109 is Valid**

| | |
|---|---|
| Owner Name: | PETTERS CONSUMER BRANDS LLC |
| Business Name: | |
| Address: | 6565 KNOTT AVE |
| | BUENA PARK |
| | CA |
| Start Date: | 01/17/2003 |

Seller's permit verification is available to help you determine if a seller's permit account number included on your customer's resale certificate is currently valid. As a seller, you are responsible for ensuring the resale certificate is properly completed. Please refer to Regulation 1668, Resale Certificates.

Back to Query Page

**Featured Services**
Verify a Permit License
Register For a Permit License
File a Return
Make a Payment
Start, Stop a Business
Free Tax Seminars

**Tax Topics**
Property Tax
Sales & Use Tax
Special Taxes & Fees
Legislation
Public Meetings

**Most Viewed**
City & County Sales Tax Rates
Forms & Publications
Sales Tax Replacement Return
Field Offices
Sales & Use Tax FAQs
Listing of County Assessors
Careers at BOE

**Access to Public Records**
Public Records Act

© 2008 State of California    Disclaimer    Privacy Notice    Report Problems with Web Site    ADA Policy    Conditions of Use    Privacy Policy

# EXHIBIT C

 **STARLITE**  Starlite Consumer Electronics (USA) Inc.

香港香港仔大道 232 號城都二業大廈三樓
3/F, Shing Dao Industrial Building,
232 Aberdeen Main Road, Hong Kong,

Tel  : (852) 2554 8803
Fax  : (852) 2873 2830
E-mail : starlite@starlight.com.hk

Petters Consumer Brands, LLC
4400 Baker Road,
Minnetonka, MN55343, USA

June 28, 2005

Dear Sir/Madam

We would like to inform you that the attached account has been assigned to Hang Seng Bank Limited.

Hang Seng Bank Limited provides a sales ledger management service which will relieve us of much of our routine book-keeping work and enable us to put our resources to more productive use.

Essentially, Hang Seng Bank Limited now becomes your creditor and payment of this account should be made direct to them. Such payment will, of course, fully discharge any indebtedness on your part.

This new system will apply to all our future sales, and all invoices will be marked for payment to Hang Seng Bank Limited who will send you monthly statements when necessary. Please ensure payment is directed to the following address quoting our name and invoice(s) no.:

By cheque to:    Hang Seng Bank Limited
                 Trade Services Centre
                 Hang Seng Tower
                 Telford Plaza 33 Wai Yip Street
                 Kowloon Bay Hong Kong

By bank transfer to:    Hang Seng Bank Ltd.
                        For Credit to Trade Services Centre
                        A/C No. 280-958224-803

Note: List of Hang Seng Bank's correspondents attached

        Telephone:      (852) 3198 8201
        Facsimile:      (852) 2351 1653

We believe there will be benefits for ourselves and our customers under this change of procedure. Apart from these new payment procedures our business relationship remains the same.

We look forward to continuing our successful trading relationship with you.

Yours sincerely



For and on behalf of
Starlite Consumer Electronics (USA) Inc.

Authorised Signature(s)



# EXHIBIT D



**PETTERS** CONSUMER BRANDS

To:    Starlite Consumer Electronics (USA) Inc.                    July 28, 2005
       5/F., Shing Dao Ind., Bldg.
       232 Aberdeen Main Road, Hong Kong

Please be advised that all the goods ordered by Petters Consumer Brands LLC (by purchase order) and billed to us should be shipped to "Circuit City Stores, Inc." until further notice.

Petters Consumer Brands LLC

Name & Position

CFO - PCB

4400 Baker Road • Minnetonka, Minnesota 55343
952.932.3145 • 800.417.1755 • 952.356.5050 fax

# EXHIBIT E

# STARLITE CONSUMER ELECTRONICS (USA) INC

5/F. SEING DAO IND., BLDG.,
232 ABERDEEN MAIN ROAD,
HONG KONG
TEL: 3471-1317 & FAX: 28730230

## INVOICE

INVOICE NO. SCB-06-0113                          DATE: MAY 29., 2006

FOR ACCOUNT OF MESSRS: PETTERS CONSUMER BRANDS LLC – 440 BAKER ROAD
MINNETONKA, MN 55343 USA

SHIPPED PER: "YM WEALTH"
                                        CARGO RECEIPT DATE: MAY 29., 2006

FROM: YANTIAN, CHINA      TO: LOS ANGELES , CA      TERMS OF PAYMENT: 60 DAYS

| MARSK & NUMBER | QUANTITY | DESCRIPTION OF GOODS | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | | | FOB YANTIAN, CHINA | |
| CIRCUIT CITY P.O. #1505769 CCS MODEL: DHM-0100 UNIT COUNT PER CARTON: 1 CARTON # 1-6478 GROSS WEIGET: 4.3 POUNDS CARTON DIMENSION (INCHES): 10.55 X 12.13 X 4.45" MADE IN CHINA | 6478 SETS | P/O NO. 2656 (CIRCUIT CITY P/O NO. 1505769) MODEL NO. DHM-0100 DVD PLAYER "POLAROID" BRAND | @US$23.50 | US$152,233.00 |

| TOTAL: | 6478 SETS = 6478 CARTONS | | | US$152,233.00 |
|---|---|---|---|---|

TOTAL AMOUNT US DOLLARS ONE HUNDRED FIFTY TWO THOUSAND TWO HUNDRED THIRTY
TWO (US$152,233.00) ONLY.

THIS INVOICE IS ASSIGNED TO, OWNED BY, AND PAYABLE ONLY TO:

BY CHECK:  HANG SENG BANK LIMITED
           FACTORING DEPARTMENT
           LEVEL 16, HANG SENG TOWER, 33 WAI YIP STREET,
           KOWLOON BAY, KOWLOON, HONG KONG

BY WIRE TRANSFER:    HANG SENG BANK LTD
                     FOR CREDIT TO TRADE SERVICES CENTRE
                     A/C NO. 230-958224-803
                     SWIFT CODE: HASEHKHH

ASSIGNEE IS ENTITLED TO GIVE A RECEIPT AND SHOULD BE ADVISED
IMMEDIATELY OF ANY CLAIMS OR DISPUTES ON PHONE NO. (852) 3198-8102

11-DEC-2006 15:31    HSE - HR3    12562  P.29

 **HANG SENG BANK**

Petters Consumer Brands, LLC
4400 Baker Road                                                      Page :        1
Minnetonka MN55343
USA

                                              Statement Date : 1 SEPTEMBER 2006

Supplier        : Starlite Consumer Ele (USA)Inc
Account Number    0335 / 0001534
Currency        . 03    USD

| Document Type | Document Date | Document Number | Due Date | Amount | Cumulative Balance |
|---|---|---|---|---|---|
| INVOICE | 24/04/06 | 06-033 | 23/06/06 | 152233.00 * | 152233.00 |
| INVOICE | 24/04/06 | 06-060 | 23/06/06 | 304466.00 * | 456699.00 |
| INVOICE | 4/05/06 | 06-066 | 3/07/06 | 152233.00 * | 608932.00 |
| INVOICE | 4/05/06 | 06-067 | 3/07/06 | 152233.00 * | 761165.00 |
| INVOICE | 8/05/06 | 06-071 | 7/07/06 | 152233.00 * | 913398.00 |
| INVOICE | 15/05/06 | 06-079 | 14/07/06 | 152233.00 * | 1065631.00 |
| INVOICE | 22/05/06 | 06-098 | 21/07/06 | 152233.00 * | 1217864.00 |
| INVOICE | 29/05/06 | 06-0113 | 28/07/06 | 152233.00 * | 1370097.00 |

                              Outstanding    1370097.00

恒生銀行有限公司 Hang Seng Bank Limited

Exhibit B

### MANUFACTURING AGREEMENT (ODM)

This Manufacturing Agreement (this "**Agreement**") is made and entered into as of February, 2005 by and among Petters Consumer Brands, LLC, a Delaware limited liability company, ("**Buyer**") and Starlite Consumer Electronics (USA) Inc. a ___Corporation___ organized under the laws of ___Cayman Islands___ (the "**Manufacturer**"). Buyer and Manufacturer are sometimes referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, Buyer desires to grant and Manufacturer desires to accept a non-exclusive manufacturing right to manufacture certain, specifically identified products.

NOW THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1) <u>Definitions</u>. In addition to the definitions contained in this Agreement, the following terms shall have the meanings set forth in this <u>Section 1</u>.

   a) "**Buyer Marks**" shall mean the trademarks and trade names (whether owned or licensed by Buyer) specified by Buyer that are to be used in connection with the manufacturing and packaging of the Products.

   b) "**Intellectual Property**" shall mean any and all patents (and applications therefore), Buyer Marks, trademarks (and applications therefore), trade secrets, trade names, trade dress, mask works, copyrights, other intellectual property rights or proprietary rights, ideas, concepts, know how, techniques, inventions, discoveries, improvements, documents, products, systems, practices, procedures, means, methods, designs, devices, programs, software, drawings and sketches, and trade secrets relating to the design, development, implementation, use, maintenance and upgrading of the Product. Intellectual Property includes, but is not limited to, subject matter that falls within the definition of patentable subject matter under the laws of the U.S. or any other country or within the definition of copyrightable materials under the laws of the U.S. or any other country.

   c) "**Products**" shall mean the goods and all related packaging and materials to be manufactured under this Agreement and described in <u>Exhibit A</u> attached hereto, as may be amended from time to time by written agreement of the parties, or as set forth in subsequent Purchase Orders (as defined below).

   d) "**Services**" shall mean the services to be provided by Manufacturer under this Agreement or as set forth in a Purchase Order.

   e) "**Specifications**" shall mean the Product and/or manufacturing specifications set forth in <u>Exhibit A</u> attached hereto, as may from time to time either be amended by written agreement of the parties, or as set forth in subsequent Purchase Orders.

2) <u>Manufacturing Rights</u>.

   a) <u>Scope</u>. This Agreement will apply to all Purchase Orders for all Products and Services placed by Buyer to Manufacturer. Manufacturer will manufacture and deliver Products and supply Services pursuant to this Agreement and applicable Purchase Orders, subject to Buyer providing

Manufacturer with the Specifications for the Product, brand information, Intellectual Property, together with any other data, firmware or required information.

b) <u>Manufacturing Right</u>. Buyer hereby grants Manufacturer and Manufacturer hereby accepts the non-exclusive, worldwide right to manufacture and package the Product in accordance with this Agreement. Manufacturer shall acquire no other right or license except as expressly granted in this Agreement. All rights not expressly granted hereunder are reserved by Buyer. Manufacturer hereby agrees to manufacture and sell to Buyer such quantities of the Products for which Buyer issues purchase orders pursuant to this Agreement. Manufacturer shall manufacture the Products in strict compliance with the Specifications. Manufacturer shall not manufacture, package, sell, ship or otherwise distribute any Products designed to the Specifications, or any Products containing any of Buyer's Intellectual Property, to any person or entity, other than Buyer.

c) <u>Subcontracting</u>. Manufacturer may engage subcontractors or vendors to provide components or subassemblies for the Products, provided that Manufacturer provides Buyer with a written notice of such subcontractors or vendors prior to such engagement. Manufacturer shall not engage any subcontractor to manufacture the Products. Notwithstanding anything herein to the contrary, Manufacturer shall be liable to Buyer for any breach of this Agreement by any such third party subcontractors or vendors.

d) <u>Changes</u>. Manufacturer shall not make changes to the Specifications without the prior written approval of Buyer. Buyer may from time to time direct that modifications be made to the design of the Products. Such modifications may originate with Buyer or may be recommended by Manufacturer. Within thirty (30) days following Manufacturer's receipt of a requested modification from Buyer, Manufacturer shall provide Buyer a binding estimate of the effect of such modification on the Manufacturing Price (as defined below). If Buyer approves the estimate in writing, Manufacturer shall make such modifications as soon as practicable upon receipt of such notice from Buyer. Further, Manufacturer agrees to advise Buyer in writing of any material changes to manufacturing processes and any changes to materials, sources of supply, or process chemistries, test procedures, quality reporting or other major processes, and to ensure that any such changes do not compromise Specifications, quality, or reliability of Products ordered pursuant to this Agreement. In the case of changes to materials or sources of supply, such notice shall be provided no less than the applicable material's lead time plus thirty (30) days prior to the effectiveness of such change. Manufacturer may not make any such changes without prior written approval from Buyer.

e) <u>Quality Assurance</u>. Manufacturer shall take all necessary actions to ensure that the Product complies in all respects with the Specifications and the quality approval procedures imposed by Buyer from time to time, including, without limitation, the delivery of product samples, packaging and wrapping material, labeling and other relevant materials. Without limiting the generality of the foregoing, Manufacturer shall comply with the following minimum quality assurance procedures:

i) Manufacturer will maintain quality assurance systems for the control of material quality, processing, assembly, testing, packaging and shipping in accordance with the Specifications and Buyer's instructions.

ii) Manufacturer will perform its standard test procedures, as well as any test procedures requested by Buyer, relating to Products and Services. Manufacturer will perform tests using the test equipment, procedures and software as agreed between Buyer and Manufacturer.

2

iii) Buyer and Buyer's customers may, during normal business hours and following reasonable notice, review Manufacturer's facilities, quality control procedures and related records as reasonably necessary for Buyer and/or Buyer's customers to satisfy themselves with Manufacturer's compliance with its obligations under this Agreement.

iv) In Buyer's sole discretion, Buyer may stop production or shipment in the event any quality issue arises. In such event, Manufacturer will make commercially reasonable efforts to ensure that such actions take place with immediate effect.



f) Quality Standards. Product quality must meet all Buyer quality standards. Defective Product shall be less than 5% for each Product shipment (the "**Defective Rate**"). If the Defective Rate exceeds 5%, Buyer shall have the right, at its discretion, to take a full credit for the related Product shipment or return such shipment, at Manufacturer's sole cost and expense, for a full refund. A Product shipment shall mean all Product that Buyer reasonably believes to be affected by such defect. A defective Product generally means any Product that is visually or operationally defective, but excludes "no-fault found" Products.

g) Packaging. All Products shall be packaged in such wrappers, cartons, boxes or other containers bearing such labeling, trade names and trademarks as Buyer may from time to time designate. This Agreement neither gives nor confers upon Manufacturer any right to manufacture, package or ship any other product of Buyer in any form on any container, except as specifically set forth herein. Manufacturer shall inform Buyer of any applicable labeling and packaging laws known to Manufacturer. Except as expressly stated in this Agreement, Manufacturer shall acquire no right, title or license to use any of Buyer's Intellectual Property.

h) Ownership.

i) Buyer shall own all Intellectual Property in any (1) inventions developed by Buyer whether pre-existing or developed under this Agreement; (2) design of any Product developed by Buyer, or developed by Manufacturer at Buyer's direction under this Agreement that are unique to Buyer; (3) inventions not previously or independently developed by Manufacturer or any third party that are inherent in any specifications, designs, customizations or product enhancements communicated by Buyer or developed by Manufacturer at the specific request of Buyer (collectively, "**Buyer's Intellectual Property**"). Buyer hereby grants Manufacturer a non-exclusive, non-assignable license to use Buyer's Intellectual Property solely to manufacture and deliver Products to Buyer in strict accordance with this Agreement. Title and ownership of Buyer's Intellectual Property shall remain with Buyer at all times. Manufacturer shall be prohibited from using any of Buyer's Intellectual Property in any product that is not manufactured for Buyer under this Agreement. Upon the expiration or termination of this Agreement, Manufacturer shall, as directed by Buyer, return to Buyer all documents, plans specifications, drawings and other materials in any form or media, relating to Buyer's Intellectual Property, and shall retain no copy thereof, except to the extent necessary to fulfill its obligations under this Agreement.

ii) Manufacturer shall own all Intellectual Property in any pre-existing inventions or other proprietary property of Manufacturer or any inventions Manufacturer develops outside the scope or independent of this Agreement (collectively, "**Manufacturer's Intellectual Property**"). Manufacturer hereby grants Buyer a non-exclusive license to use, perform, distribute Manufacturer's Intellectual Property, or to have any of these activities performed on its behalf, but only as is necessary to market, sell and support the Products manufactured by Manufacturer under this Agreement. Title and ownership of Manufacturer's Intellectual

3

Property shall remain with Manufacturer at all times. Buyer shall be prohibited from using any of Manufacturer's Intellectual Property in any product that is not manufactured by Manufacturer under this Agreement. Upon the expiration or termination of this Agreement, Buyer shall, as directed by Manufacturer, return to Manufacturer all documents, plans specifications, drawings and other materials in any form or media, relating to Manufacturer's Intellectual Property, and shall retain no copy thereof, except to the extent necessary to fulfill its warranty obligations for the Products manufactured by Manufacturer under this Agreement.

iii) Except as set forth above, the parties will decide on a case-by-case basis their respective rights with regard to the Intellectual Property inherent in any inventions that are jointly developed by the parties. In the event the parties are unable to agree on their respective rights with regard to any such inventions, the parties shall jointly own such inventions with no obligation of accounting.

iv) Manufacturer shall provide to Buyer, no later than two weeks after accepting a Purchase Order, an itemized list of all trade names, trademarks, licenses, and other intellectual property or proprietary rights relating to the Product.

i) <u>Services</u>. Buyer may engage Manufacturer to render consulting, design, engineering or other Services in connection with Products to be manufactured hereunder. In the event that Buyer desires to engage Manufacturer to render such Services, the Parties shall execute a Statement of Work or other document that shall include a description of the Services to be rendered, any milestones or delivery dates or other terms relevant to such engagement. To the extent the results of Manufacturer's performance of such services may constitute "work made for hire" for Buyer under the US Copyright Revision Act of 1976, as amended from time to time, then such works shall be considered "work made for hire" by the parties.

3) <u>Pricing</u>.

a) <u>Manufacturing Price</u>. Buyer shall purchase the Product from Manufacturer at prices (the "**Manufacturing Price**") to be mutually agreed upon by the Parties and set forth in relevant Purchase Orders (as defined below).

b) <u>Price Protection</u>. Manufacturer represents and warrants that the Manufacturing Price will not be less favorable than prices applicable to sales by Manufacturer to any other customer purchasing comparable products under substantially similar terms and conditions. If at any time during the term of this Agreement Manufacturer gives to any other such customer more favorable prices, Manufacturer will immediately adjust the Manufacturing Price to such lower price. Manufacturer shall also credit Buyer the difference in price between the old Manufacturing Price and the new lower Manufacturing Price, multiplied by the number of units Buyer has received starting when the other customer began receiving the lower priced products from Manufacturer.

c) <u>Taxes, Etc</u>. All prices shall be in United States Dollars and are exclusive of applicable sales taxes, but are inclusive of all other charges including any charges for labeling, packing and crating, any finishing or inspecting fees, any applicable royalties, duties and all other taxes. Buyer will have no liability for any tax for which it has an appropriate exemption. Buyer will provide Manufacturer with evidence of such exemption.

4

4) Product Orders.

    a) Purchase Orders. All purchases of the Product by Buyer shall be placed by written purchase orders (each, a "Purchase Order") delivered by Buyer to Manufacturer at least 60 days prior to the required delivery date. Purchase Orders shall identify the Product ordered, the quantity thereof, price, specific delivery dates and such other information as the Parties mutually agree. Purchase Orders shall be accepted or rejected by Manufacturer, in writing, within 48 hours of receipt thereof (excluding weekends and nationally recognized holidays). Manufacturer will be deemed to have accepted a Purchase Order if it fails to reject the Purchase Order by notifying Buyer within 48 hours of its receipt thereof (excluding weekends and nationally recognized holidays). Acceptance of a Purchase Order by Manufacturer is a reaffirmation of its acceptance of the terms of this Agreement as well as an acceptance of the terms and conditions attached to each Purchase Order. Manufacturer shall use commercially reasonable efforts to comply with Buyer's requests to reschedule Purchase Orders.

    b) Terms and Conditions. The terms and conditions in this Agreement and attached to the Purchase Orders shall be the exclusive contract terms between the Parties with respect to Buyer's purchase of the Products. In the event of any inconsistencies between the terms and conditions attached to a Purchase Order and any terms in the body of this Agreement, the terms contained in the body of this Agreement shall govern. In the event of inconsistencies between the terms of this Agreement (or applicable Purchase Order) and any other documents submitted by Manufacturer, including, without limitation, any acceptance document or invoice, the terms of this Agreement (or applicable Purchase Order) shall govern. Buyer objects to any terms set forth in Manufacturer's acceptance documents or in Manufacturer's invoices that are different from or additional to the provisions of this Agreement (or applicable Purchase Order), and no such terms shall be binding upon Buyer unless Buyer specifically consents thereto in writing.

5) Shipping and Delivery.

    a) Shipment. Manufacturer will package the Products for international shipment in accordance with standard commercial practices and in a manner that will minimize risk of damage in transit. Invoices, packing slips and containers must bear the Purchase Order number, stock number, vendor lot number, and description of item, together with shipping quantity, in a clearly visible position. Invoices and packing slips must be marked "complete" when final shipment is involved. Buyer shall specify the carrier or method of transportation in each Purchase Order. Buyer shall also have the right to require special, express or air shipments if Manufacturer fails or will fail to meet the delivery requirements of the Purchase Order. In addition, Buyer shall have the right to assess late delivery penalties to Manufacturer for deliveries that fail to meet the delivery requirements of the Purchase Order, including, without limitation, cost of all additional freight charges incurred to reduce the amount of time the delivery is late, penalties equal to Buyer's expedited logistics costs and/or actual late delivery penalties assessed by Buyer's customer, storage and other reasonable costs incurred by Buyer as well as other remedies for non-compliance with this Agreement. Manufacturer shall pay for any resulting additional transportation costs, unless due solely to causes beyond the control and without the fault or negligence of Manufacturer. Products shipped pursuant to a valid Purchase Order, unless otherwise set forth in the Purchase Order, are DDP Los Angeles / Long Beach or any other location or Incoterm mutually agreed upon by the parties (as such term is defined in Incoterms 2000, published by the International Chamber of Commerce, see http://www.iccwbo.org/incoterms/wallchart/wallchart.pdf) and must be shipped to assure arrival at the "ship to" point free of damage.

b) <u>Declaration of Conformity.</u>   All Products shipped to Buyer by Manufacturer shall be accompanied by a declaration of conformity stating that the Products conform to the Specifications and meet all required design and quality standards as agreed upon by Buyer and Manufacturer.

c) <u>Title to Products, Risk of Loss.</u> Notwithstanding anything in this Agreement to the contrary, title to and risk of loss of the Products shall pass to Buyer only upon receipt of the same by Buyer, and any rightful rejection or revocation of any Products by Buyer shall immediately shift the risk of loss of such Products, wherever located, to Manufacturer. Manufacturer agrees that any contrary provisions of the Uniform Commercial Code shall not apply to this Agreement. No charges will be allowed for boxing, containers or cartage unless agreed upon in writing in the Purchase Order.

d) <u>Delivery Schedule.</u>  Deliveries must be made in a manner to ensure receipt by Buyer at the times specified in each Purchase Order unless Buyer is promptly notified and agrees in writing to alternate dates.  TIME IS OF THE ESSENCE IN THIS AGREEMENT WITH RESPECT TO THE SPECIFIED DELIVERY DATES.  If Manufacturer is unable to meet the specified delivery dates, Manufacturer must notify Buyer immediately in writing.  If Manufacturer indicates in such writing that any delivery of the Products is going to be more than five days later than the delivery date specified in the Purchase Order, Buyer shall have the option to (i) cancel such Purchase Order without penalty or any liability to Manufacturer, or (ii) to agree in writing to a change in the specified delivery date as well as assess late fees, as specified in <u>Section 5(a).</u>    If Manufacturer delivers any Product more than five days later than the delivery date specified in the Purchase Order and such change of delivery date was not approved in writing by Buyer, Buyer shall have the right to reject the Products and return them to Manufacturer, at Manufacturer's sole cost and expense, in addition to such other rights and remedies provided by law.  In the event Buyer cancels a Purchase Order after receipt of late delivery notification from Manufacturer or Manufacturer delivers the Product more than five days after the specified delivery date without prior approval of Buyer, Manufacturer shall pay whatever additional cost, expense, loss or damage Buyer sustains as a result of the cancellation or late delivery, including, without limitation, lost sales, lost profits and any incidental and consequential damages, unless the delay is due to unforeseeable causes beyond the control and without the fault or negligence of Manufacturer.

6) <u>Inspection and Acceptance.</u>

a) <u>Inspection.</u>  Manufacturer shall provide and maintain an adequate inspection system covering the supplies, processing methods, special tooling, materials, workmanship and finished Products ordered hereunder. Manufacturer shall make its inspection records of all work and materials and finished Products available to Buyer during the term of this Agreement and for such longer period as may be necessary. Buyer shall have the reasonable right and opportunity to inspect and test all supplies, processing methods, special tooling, materials, workmanship and finished Products ordered hereunder to the extent practicable at all times and places including at the places and during the periods of manufacture. Buyer shall also have the reasonable right to inspect the place of manufacture of suppliers from whom Manufacturer has purchased any supplies or materials used in the manufacture of the Products.

b) <u>Acceptance.</u>  Buyer shall not be deemed to have accepted any Products until the expiration of a reasonable period of time for inspection after receipt, which period of time shall not be less than two weeks after receipt of such Products at Buyer's United States distribution center. The Parties acknowledge and agree that the Buyer may inspect any commercial lot of Products consisting of numerous units of the same Product by inspecting only a reasonable sample of such units and that

6

Buyer may revoke acceptance of any other units of such commercial lot which Buyer discovers to be defective within a reasonable time after Buyer discovers the grounds for such defect. In case any Products are defective in materials or workmanship or otherwise not in conformity with the requirements of this Agreement, the Specifications or any samples provided, or appropriate Purchase Order, Buyer shall have the right, notwithstanding payment or any prior inspection or test, either to reject or revoke acceptance to such defective Products and to require that Manufacturer promptly replace or repair (at Buyer's option) at Manufacturer's own expense any defective Products after Manufacturer receives notice of defect. If the Manufacturer fails promptly to replace or repair such Products after Buyer requests Manufacturer to do so, Buyer, in its sole discretion, may either (i) by contract or otherwise, replace or repair such Products and charge to Manufacturer the increased cost incurred by Buyer to in doing so; (ii) accept the delivery of such Products, subject to a reduction in Manufacturing Price reflecting the reduced value attributable to the nonconformance; or (iii) effect a cancellation for default subject to reimbursement by Manufacturer to Buyer of any damages resulting from such failure, including, without limitation, reimbursement for lost sales, lost profits and all direct, incidental or consequential damages. Manufacturer assumes all transportation and handling costs and the risk of damage to or loss of defective Products delivered hereunder. Payment for Products prior to inspection shall not constitute acceptance thereof.

c) <u>Security for Rejected Products</u>. Manufacturer hereby grants Buyer a security interest in any of the Products that Buyer rightfully rejects, or with respect to which Buyer rightfully revoked acceptance, to secure payment by Manufacturer of any portion of the purchase price with respect to such Products paid by Buyer and any damages suffered or losses incurred by Buyer arising out of or relating to the defect or nonconformity giving rise to such rejection or revocation.

7) <u>Support and Training</u>.

a) Manufacturer shall provide Buyer or its designees with such training related to the manufacturing, operation and any other technical information relating to the Products as Buyer may reasonably deem necessary to assist Buyer in the sale and customer support of the Products as more fully set forth in the Service and Returns Agreement attached hereto as <u>Exhibit B</u> (the "**Service and Returns Agreement**"), the terms of which are hereby incorporated by reference. Without limiting the foregoing, Manufacturer shall provide for each Product a written user's manual or instructions, as well as a written technical or repair manual including an itemized bill of materials for all component parts and accessories, all at no additional cost, each in the English language, or other language(s) specified by Buyer.

b) Manufacturer shall accept all products requiring service as returns as outlined in the Service and Returns Agreement.

c) In the event that replacement units are not shipped to Buyer within seven days of request, Buyer shall have the right to return any units in need of repair to Manufacturer at Manufacturer's expense for a full refund.

d) Buyer shall have the right to return to Manufacturer for full refund any component parts, replacement units or accessories held by Buyer in stock in the event that such component parts or accessories become outdated or changed.

7

8) <u>Intellectual Property</u>.

   a) <u>Use of Trademarks</u>.  Buyer hereby grants to Manufacturer a nonexclusive, nontransferable and royalty-free right and license to use the Buyer Marks in connection with the manufacturing and packaging of the Products for so long as such Buyer Marks are used by Manufacturer in strict accordance with Buyer's standards, specifications and instructions, but in no event beyond the term or limits of this Agreement.  Manufacturer shall acquire no right, title or interest in the Buyer Marks other than the foregoing limited license, and Manufacturer shall not use the Buyer marks as part of Manufacturer's corporate or trade name or on anything other than the specific Products authorized by Buyer.  It is understood and agreed that the all rights to sell, price, market, license, distribute, or manufacture the Products or any Intellectual Property related thereto remain, as between Manufacturer and Buyer, wholly owned by Buyer.

   b) <u>Termination of Use</u>.  Manufacturer acknowledges Buyer's proprietary rights in and to Buyer's Intellectual Property and any trademarks or trade names regularly applied by Buyer to the Products, and Manufacturer hereby waives in favor of Buyer all rights to any Intellectual Property now or hereafter originated or licensed by Buyer.  Manufacturer shall not duplicate, adopt, use or register any words, phrases, symbols, designs, technology or anything else that is identical to or confusingly similar to any of Buyer's Intellectual Property.  Upon termination of this Agreement, Manufacturer shall cease and desist from use of Buyer's Intellectual Property in any manner.

   c) <u>Ownership of Intellectual Property</u>.  All Intellectual Property owned by or licensed to Buyer will continue to be owned by or licensed to Buyer.  Manufacturer is licensed to use or have used such Intellectual Property rights only to the extent necessary for the Manufacturer to perform its obligations to the Buyer under this Agreement and once such obligations have been performed, the above license shall immediately terminate.

   d) <u>Violation</u>.  Except as specifically set forth in this <u>Section 8</u>, nothing in this Agreement grants to Manufacturer any rights to any Intellectual Property owned by or licensed to Buyer.  Any violation of this <u>Section 8</u> shall be deemed a material violation of this Agreement and Buyer shall have the right to immediately terminate this Agreement and seek monetary and equitable damages.

9) <u>Representations</u>.

   a) <u>Representations</u>.  Manufacturer represents and warrants to the Buyer that (i) it has the authority to enter into this Agreement and to sell the Products to Buyer, free and clear of all liens, charges, encumbrances, or other restrictions; (ii) the Products will be free from defects in manufacture, material and workmanship, and will be fit and safe for the use(s) normally and reasonably intended; (iii) the Products are of merchantable quality and are manufactured and will perform in conformance with Specifications and Manufacturer samples; (iv) the Products and all materials provided to Buyer under this Agreement are new products and do not contain anything used, refurbished or reconditioned; (v) the Products (including their labeling and packaging) will not violate or infringe any Intellectual Property of any third party or any other right of any third party, nor will their resale by Buyer or any customers of Buyer; (vi) Manufacturer has paid and will continue to pay throughout the term of this Agreement all licenses and/or royalties related to the Products (Manufacturer shall provide Buyer evidence of payment of all such licenses and royalties prior to delivery of Product); (vii) Manufacturer will provide a manufacturer's warranty to end-users of the Products in accordance with the Service and Returns Agreement; (viii) Manufacturer is ISO 9002 certified, or certified by similarly recognized standards; and (ix) the Products are not produced, manufactured, assembled or packaged by the use of forced labor,

8

prison labor or forced or illegal child labor and that the Products were not trans-shipped for the purpose of mislabeling, evading quota or country of origin restrictions or for the purpose of avoiding compliance with forced labor, prison labor or child labor laws.

b) <u>Compliance With Laws</u>. Manufacturer represents and warrants that all Product is manufactured, processed, packaged, labeled, tagged, tested, certified, accurately marked, weighed, inspected, shipped and sold in compliance with all applicable industry standards and all applicable federal, state, provincial and local laws, treaties and regulations, including, without limitation, all laws and regulations relating to health, safety, environment, serial and identification numbers, manufacturing, packaging, labeling and country of origin designation, all toxic substances, OSHA and EPA regulations, customs and importation requirements, the Foreign Corrupt Practices Act and voluntary or mandatory compliance certifications (e.g., Underwriter's Laboratories, Inc., CE, CSE, etc.). Manufacturer shall provide Buyer with evidence of all such certifications prior to delivery of Product.

c) <u>Notification</u>. Manufacturer will promptly notify Buyer upon learning of any apparent breach of the provisions contained in this <u>Section 9</u>, and the parties shall thereafter discuss a procedure to be followed to minimize any loss therefrom. Buyer's sampling of Product or approving Product for shipment will neither relieve Manufacturer from the warranties contained herein nor be a waiver of any rights arising hereunder. Manufacturer's representations and warranties contained in this <u>Section 9</u> are essential conditions of this Agreement, and any breach thereof shall give Buyer the right to reject the Products so affected, and to terminate this Agreement.

10) <u>Product Warranty, Recall and Returns</u>.

a) <u>Product Warranty</u>. Manufacturer warrants that at the time of delivery by Manufacturer to Buyer, and for a period of one year after the resale of the Product to end-users, all Products (i) shall be manufactured in accordance with the Specifications and Buyer's instructions and directions, (ii) shall be free from defects in design, manufacture, materials and workmanship, (iii) shall be in merchantable condition and fit for the intended purpose, and (iv) shall operate within the Specifications.

b) <u>Recall</u>. In the event of (i) a government directed recall or statutory seizure, or (ii) that the quality of any Product is found to be unacceptable by Buyer and Buyer acts, in its sole discretion, to commence a recall of such Products from distributors, retailers, or other parties in the chain of distribution for destruction or other disposition as determined by Buyer, Manufacturer shall use all reasonable efforts to assist in such recall. In the event of a recall or a statutory seizure of any Product, Manufacturer shall reimburse Buyer for its reasonable expenses (including, without limitation, Product costs) incurred in connection with any such recall or seizure.

c) <u>Returns</u>. Unless otherwise set forth in a Purchase Order, Buyer will have the right to return any Products (i) against which an allegation is made that the use of such Products infringe on any patent, trademark, trade secret, trade dress, copyright, right of privacy or publicity, or any other tangible or intangible proprietary or Intellectual Property right; (ii) that are not designed, manufactured, packaged or labeled in accordance with the Specifications, industry standards and/or all applicable laws, ordinances, rules and regulations; (iii) that are shipped in error or in non-conformance with the applicable Purchase Order or Specifications; (iv) that have caused injury to person or property; (v) that are damaged or defective, in Buyer's sole discretion; or (vi) as otherwise provided in the Service and Returns Agreement.

9

    d) <u>Remedies</u>. Without limiting any other rights available to Buyer, including, without limitation, Buyer's right to indemnification hereunder, in the event any Products shall not conform to the representations or warranties contained in this Agreement, or are returned by Buyer, Manufacturer shall, at Buyer's option, either (i) replace them without cost to Buyer, or (ii) credit or refund Buyer the Manufacturing Price for such Products and Buyer may offset any such amounts against amounts Buyer owes Manufacturer. In addition, Manufacturer shall pay Buyer all other charges paid by Buyer in connection with such nonconforming Products. Product manufactured and still within Manufacturer's possession but not within warranty shall be destroyed or disposed of pursuant to instructions provided Buyer, at the sole cost and expense of Manufacturer. In no event shall Manufacturer sell, distribute or ship any Product not meeting the warranty contained herein or in violation of Buyer's instructions to destroy.

11) <u>Payment</u>. Unless otherwise stated in the Purchase Order, Buyer shall make payment according to the following:

    a) On or before the day of title transfer, Buyer shall post a standby Letter of Credit for one-half of the outstanding Purchase Order balance, with release of such Letter of Credit and full payment made to Manufacturer 45 days after Buyer has taken title to the Products at the designated delivery point.

    b) Payment terms will be reviewed every three months.

12) <u>Performance</u>. At all times during the term of this Agreement, Manufacturer shall maintain the necessary facilities capable of fulfilling all Purchase Orders from Buyer for timely delivery of the Product and otherwise fulfilling all obligations of Manufacturer under this Agreement. Manufacturer will keep Buyer advised, on a commercially reasonable basis, of the status of all outstanding and undelivered Purchase Orders. Manufacturer shall promptly notify Buyer if Manufacturer shall not be able to comply with any provision hereunder or under any term of a Purchase Order.

13) <u>Confidentiality</u>.

    a) <u>Definition</u>.  The term "Confidential Information" as used in this Agreement means any information or compilation of information that is proprietary to either Party and relates to the disclosing Party's existing or reasonably foreseeable business, including, without limitation, trade secrets and information relating to the Products, marketing strategies, product development and design, Specifications, pricing, costs, financing methods, financial information, Intellectual Property, manufacturing processes, all customer information and any other information about the disclosing Party's business that is normally considered confidential or which is indicated in writing by the disclosing Party to be confidential or trade secret. Confidential Information shall not include any information that (i) is part of the public domain at the time of disclosure or becomes part of the public domain through no fault of the receiving party; (ii) was already in the receiving Party's possession, as evidenced by written documentation, prior to the disclosure of such information to the receiving Party by the disclosing Party; or (iii) is subsequently disclosed to the receiving Party on a non-confidential basis by a third party who is not under any obligation of confidentiality relating to such disclosed information.

    b) <u>Nondisclosure</u>. During the term of this Agreement and at all times thereafter, the receiving Party shall hold in the strictest of confidence and to never disclose, transfer, convey, make assessable to any person or use in any way Confidential Information of the disclosing Party for the receiving Party's own or another's benefit or permit the same to be used in competition with the disclosing Party, unless expressly agreed to in writing by the disclosing Party.

c) <u>Protective Action</u>.   The receiving Party shall protect the Confidential Information of the disclosing Party from unauthorized use or disclosure by using the same degree of care as the receiving Party uses to protect its own confidential information of a like nature, but no less than a reasonable degree of care.   The receiving Party will take reasonable precautions to prevent its employees, representatives, agents and others from disclosing or appropriating for their own use any of the Confidential Information of the disclosing Party.

d) <u>Injunctive Relief</u>.  In addition to any other relief afforded by law, the Parties shall have the right to enforce covenants contained in this <u>Section 13</u> by specific performance and preliminary, temporary and permanent injunctive relief against a recipient of such Party's Confidential Information.  Each Party agrees that the other Party shall be entitled to an injunction without the posting of any bond, enjoining or restraining any recipient from any violation or violations of the confidentiality provisions of this <u>Section 13</u>.  Damages, specific performance and injunctive relief shall be considered proper modes of relief and are not to be considered alternative remedies.

14) <u>Indemnification</u>.  Manufacturer hereby agrees to be responsible for, to defend and indemnify Buyer and to hold its directors, officers, employees, shareholders, agents, affiliates, successors and assigns, harmless from any and all liabilities, claims, demands, causes of action or damages (including, without limitation, reasonable attorney's fees and settlement amounts) relating to or arising out of (a) any allegation of personal injury or property damage resulting from any Product, (b) any breach or threatened breach of this Agreement, or (c) anything else relating to the manufacture or use of the Products, including, without limitation, claims, demands, causes of action, and damages based upon intellectual property rights owned by third parties, alleged defects in the Products and Product recalls and returns.  Without limiting the generality of the foregoing, Manufacturer expressly agrees that it shall hold Buyer harmless from and indemnify Buyer against any and all claims of loss of the Products.  Notwithstanding anything to the contrary in this Agreement, failure of Manufacturer to perform any of its obligations under this Section shall give Buyer the right to immediately terminate this Agreement, effective upon written notice to Manufacturer.

15) <u>Insurance</u>.

a) Throughout the term of this Agreement and thereafter upon prior annual written request by Buyer for each of the five years following the date of expiration or termination of this Agreement, Manufacturer, at its sole cost and expense, shall obtain and maintain the following insurance policies from a recognized insurance company qualified to do business in the United States of America or such other jurisdictions as Buyer may from time to time request:

i) Comprehensive General Liability (including product and completed operations, personal and advertising injury and contractual liability coverage), with a minimum of $2,000,000 general aggregate limit; $2,000,000 products and completed operations aggregate limit; and $1,000,000 each occurrence, written on an occurrence form; and

ii) Product Liability insurance and Product Recall insurance, providing protection for Buyer and its subsidiaries, parent, affiliates and licensors as named insureds in the following amount of coverage:  $2,000,000 combined single limit with an umbrella policy of at least $10,000,000, against any claims, demands, or causes of action or damages, including reasonable attorney's fees, arising out of any alleged defects in such articles, or any sale, distribution or use thereof.

iii) Umbrella coverage of not less than ten million dollars ($10,000,000).

11

b) Annually, upon each renewal (or at other appropriate intervals), Manufacturer will supply Buyer with a Certificate of Insurance with respect to each of the foregoing policies that names Buyer, its subsidiaries, parent, affiliates and licensors as Additional Insureds, and which also provides that such insurance will not be canceled or changed unless at least 30 days prior written notice has been given to Buyer. Manufacturer's insurance will be primary and required to respond to and pay claims prior to other coverage. Coverage and limits referred to above shall not in any way limit the liability of Manufacturer and may be required to be increased to stay current with industry standards.

16) Term. The term of this Agreement shall continue in full force and effect for an initial one year term (the "**Initial Term**"). Upon expiration of the Initial Term, this Agreement shall automatically extend and renew for successive one year terms (collectively the "**Renewal Terms**"). Notwithstanding the foregoing, any party hereto may terminate this agreement at the end of the Initial Term or Renewal Term, as applicable, upon 60 days prior written notice to the other parties.

17) Termination. In addition to the foregoing, this Agreement may be terminated in any manner provided below:

a) Termination for Convenience. Either Party may terminate this Agreement upon 90 days advance written notice to the other Party.

b) Breach of Agreement. This Agreement may be terminated by either Party for failure by the other Party to cure a default in any material term or condition of this Agreement. Such termination shall be effective 30 days following the receipt of written notice of the default, unless the default is cured within such default period.

c) Insolvency. Either Party may terminate this Agreement effective immediately upon delivery of written notice to the other Party if the other Party (i) is unable to pay its debts as they mature or admits in writing its inability to pay its debts as they mature, (ii) makes a general assignment for the benefit of creditors, (iii) files a voluntary petition for bankruptcy or has filed against it an involuntary petition for bankruptcy, or (iv) applies for the appointment of a receiver or trustee for substantially all of its assets or permits the assignment of any such receiver or trustee who is not discharged within a period of thirty (30) days after such appointment.

d) Inability to Deliver Product. Buyer may terminate this Agreement effective immediately upon delivery of written notice to Manufacturer if any event of force majeure or other event prevents Manufacturer from filling orders for the Products and such inability continues uncured for a period of 15 days or more.

e) Inability to Promptly Remit Payment. Manufacturer may terminate this Agreement upon delivery of 30 days prior written notice if Buyer fails to pay Manufacturer any undisputed amount for Products as set forth in this Agreement or any applicable Purchase Order and fails to cure such non-payment during such 30 day period.

f) Purchase Orders. Buyer may immediately terminate a Purchase Order upon delivery of written notice to Manufacturer if Buyer is prohibited from using the Buyer Mark associated with such Purchase Order.

12

18) Rights and Obligations Upon Termination.  Upon termination of this Agreement, the following provisions shall apply:

   a) Return of Confidential Information.  Upon termination of this Agreement, each Party shall, within 10 days after the effective date of such termination, return to the other Party all copies of materials and documents or copies thereof containing any Confidential Information of the other Party.

   b) Open Purchase Orders.  Upon termination of this Agreement, all Purchase Orders submitted by Buyer but not yet delivered by Manufacturer prior to the effective date of termination may be canceled or confirmed at Buyer's option.  Buyer shall pay for all Products shipped by Manufacturer pursuant to confirmed Purchase Orders in accordance with the terms contained in this Agreement.

   c) Existing Accounts Receivable.  Buyer shall pay when due any invoices issued by Manufacturer for Products manufactured and shipped prior to the effective date of expiration or termination of this Agreement in accordance with the terms and conditions of this Agreement.  Manufacturer shall pay Buyer, upon demand, any credit balance.

   d) Reservation of Rights and Remedies.  Any Party who terminates this Agreement in accordance with the terms of this Agreement shall also have all other rights and remedies available under law or equity for any claim it may have against the other Party whether for breach of contract or otherwise.

   e) Surviving Obligations.  Each Party's rights and obligations under the provisions of each section that, by their nature, should survive the termination of this Agreement, shall survive any termination of this Agreement and continue in full force and effect.

19) Notices.  Unless otherwise directed in writing by a Party, all notices, demands, waivers, requests, consents and other communications under this Agreement shall be in writing and shall be deemed to have been delivered on the date personally delivered or on the date deposited in the United States Postal Service, postage prepaid, by certified mail, return receipt requested, delivered by Federal Express overnight delivery, or delivered by electronic facsimile and confirmed:

| If to Manufacturer: | If to Buyer: |
|---|---|
| Starlite Consumer Electronics (USA) Inc.<br>Attention: Mr. Philip Lau<br>5/F Shing Dao Industrial Building<br>232 Aberdeen Main Road, Hong Kong<br>Fax:   852-2555  8498 | Petters Consumer Brands, LLC<br>Attention: CEO<br>4400 Baker Road<br>Minnetonka, MN  55343<br>Fax: _____ |
|  | cc: General Counsel |

20) Audit.  During the term of this Agreement, Buyer may cause an audit to be made of Manufacturer's books and records and an inspection to be made of Manufacturer's facilities and procedures.  Any audit and/or inspection shall be conducted during regular business hours at Manufacturer's facilities, with or without notice.  Manufacturer shall provide the auditing party's designated audit or inspection team with access to the relevant Manufacturer records and facilities.  Buyer will pay the cost of any such audit or inspection; provided however, in the event Manufacturer is deemed to be in violation of any term or condition of this Agreement, Manufacturer will promptly reimburse Buyer for all costs of

the audit or inspection. Buyer designated auditors may be escorted by Manufacturer personnel when on Manufacturer premises, and shall not unreasonably interfere with Manufacturer's normal course of business.

21) <u>Dispute Resolution</u>. Any controversy or claim arising out of or relating to this Agreement shall be determined by arbitration in accordance with the International Arbitration Rules (the "**Rules**") of the International Centre for Dispute Resolution of the American Arbitration Association. Such arbitration shall be conducted before a single arbitrator appointed in accordance with the Rules. The arbitration shall be conducted in the English language. The place of arbitration shall be Minneapolis, Minnesota, United States of America. Any decision rendered by the arbitrator shall be final and binding on the parties, and judgment thereon may be entered by any court of competent jurisdiction. The parties expressly agree that the arbitrator shall be empowered to award and order equitable or injunctive relief with respect to matters brought before it.

22) <u>General Provisions</u>.

    a) <u>Controlling Law</u>. This Agreement shall be interpreted and governed by the laws of the State of Minnesota, USA, without application of its conflict of law provisions. The U. N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

    b) <u>Severability</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

    c) <u>Existence and Authority</u>. Buyer and Manufacturer each hereby represent and warrant that (i) such Party is validly incorporated or organized under the laws of the jurisdiction of its incorporation or organization, is validly existing and authorized to do business in the jurisdictions where such Party currently does business; (ii) such Party has full power and authority to enter into and deliver this Agreement and to perform its obligations hereunder; (iii) such Party has duly authorized the person executing this Agreement on behalf of such Party to do such; and (iv) this Agreement constitutes the legal, valid and binding obligations of each Party hereto, enforceable against it in accordance with its terms.

    d) <u>Government Authorization</u>. No notification, authorization, consent or approval of, or notice to, or filing or registration with, any governmental authority is required to be obtained or given, and no waiting period is required to expire, in connection with each Party's execution and delivery of this Agreement and the performance of its obligations hereunder.

    e) <u>Entire Agreement</u>. This Agreement contains the entire contract between the Parties as to the subject matter hereof and supersedes any prior or contemporaneous written or oral agreements between the Parties with respect to the subject matter hereof.

    f) <u>Modifications and Waivers</u>. No purported amendment, modification or waiver of any provision of this Agreement shall be binding unless set forth in a written document signed by all Parties (in the case of amendments and modifications) or by the Party to be charged thereby (in the case of waivers). Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term or provision of this Agreement or of the same circumstance or event upon any recurrence thereof. Any failure by any Party to detect, protest, or remedy any breach of this Agreement shall not constitute a waiver or impairment of any such term or condition, or the right of such Party at any time to avail itself of such remedies as it may have for any breach or breaches of such term or condition.

g) Further Assurances. From time to time, at the request of any Party hereto and at the expense of the Party so requesting, each Party shall execute and deliver to the requesting Party such documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.

h) Offset. Buyer may offset from Manufacturer's invoice any indebtedness of Manufacturer to Buyer, whether or not related to this Agreement. The exercise of such right of offset by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default hereunder.

i) Assignment/Binding Nature. Except as set forth in Section 1(c), Manufacturer shall not delegate any of its duties or assign any of its rights under this Agreement to any third party unless Buyer has specifically consented to such delegation or assignment in writing. This Agreement shall be binding upon Buyer's successors and assigns and upon Manufacturer's successors and permitted assigns approved by Buyer as provided above.

j) No Partnership; Joint Venture; Agency. This Agreement does not constitute and shall not be construed as constituting a partnership under applicable state law nor a joint venture agreement among the Parties. No Party shall have any right to obligate or bind another Party in any manner whatsoever as a result of this Agreement, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons. Neither Buyer on one hand nor Manufacturer on the other are intended to be nor shall be considered an agent for the other.

k) Force Majeure. Neither Party shall be in default by reason of any failure in performance of this Agreement if such failure arises, directly or indirectly, out of causes reasonably beyond the direct control of or foreseeable by such Party, including, but not limited to, acts of God or of the public enemy, U.S. or foreign governmental acts in either a sovereign or contractual capacity, fire, wind, flood, accident, epidemic, restrictions, strikes or freight embargoes or because of any law, order, proclamation, regulation or ordinance of any governmental authority or any other unforeseeable act or action of like character.

l) Construction. Should any provision of this Agreement require judicial interpretation, the Parties agree that the forum interpreting or construing the same shall not apply a presumption that this Agreement shall be more strictly construed against one Party than another.

m) English Language Controls. This Agreement and all related Purchase Orders and other documents shall be construed and interpreted in the English language. If this Agreement exists in another language, the English version of this Agreement shall be the official version and shall control. All monetary amounts referenced herein shall be in United States dollars.

n) Counterparts; Facsimile. This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and each of which alone and all of which together, shall constitute one and the same instrument, but in making proof of this Agreement it shall not be necessary to produce or account for each copy of any counterpart other than the counterpart signed by the Party against whom this Agreement is to be enforced. This Agreement may be transmitted by facsimile, and it is the intent of the Parties for the facsimile (or a photocopy thereof) of any autograph printed by a receiving facsimile machine to be an original signature and for the facsimile (or a photocopy thereof) and any complete photocopy of the Agreement to be deemed an original counterpart.

> WITHOUT LIMITING THE GENERALITY OF ANY PROVISION IN THIS AGREEMENT, MANUFACTURER UNDERSTANDS AND AGREES THAT IT SHALL HAVE THE SOLE RESPONSIBILITY TO OBTAIN ALL NECESSARY LICENSES FROM THIRD PARTIES THAT CLAIM A PATENT, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY OR PROPRIETARY RIGHT IN THE PRODUCTS. MANUFACTURER SHALL PAY ANY FEES OR ROYALTIES TO SUCH THIRD PARTIES. THE COST OF THE PRODUCTS CHARGED TO BUYER SHALL REFLECT THE TOTAL COST OF PRODUCTION INCLUDING BUT NOT LIMITED TO ANY SUCH FEES AND ROYALTIES PAYABLE TO THIRD PARTIES.

IN WITNESS WHEREOF, the parties hereto have caused this Manufacturing Agreement (ODM) to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

*Buyer:*                                    *Manufacturer:*

**PETTERS CONSUMER BRANDS, LLC**     **STARLITE CONSUMER ELECTRONICS (USA) INC.**

By: _____         By: _____
Name:   Lorence A. Harmer            Name:   Thomas Lam
Its:    Chief Executive Officer      Its:    President
                                             Marketing

5244v5

16

**EXHIBIT A**

*Product and Specifications*

**Vendor:Starlite Consumer Electronics (USA) Inc.**
**Model:DVD227**

**Description:    DVD Player**

**Key Features:**

·Supports CD, MP3, CDR and CDR-R/W playback
·Supports Picture CD, DVDR, DVDRW
·Dolby Digital audio output
·Dolby Digital decoder:  2 channels
·NTSC video output
·On screen display menu
·TV aspect selection:  16:9 / 4:3 pan and
scan / 4:3 letterbox
·Audio language selection
·Subtitle selection
·Parental control with pin lock
·Multi-angle
·Zoom
·Fast forward/backward, slow forward, skip
forward/backward and step forward functions
·Repeat A < - > B, repeat one/all functions

**Connections:**
·Coaxial digital audio output
·Progressive scan output
·S-video output
·Composite video output
·2 channel audio output



**EXHIBIT B**
*Service and Returns Agreement*

# SERVICE AND RETURNS AGREEMENT

This Service and Returns Agreement (the "**Agreement**") is made and entered into as of _____day of March, 2005 by and among Petters Consumer Brands, LLC, a Delaware limited liability company, ("**Buyer**") and Starlite, a company organized under the laws of _____ (the "**Manufacturer**"). Buyer and Manufacturer are sometimes referred to collectively as the "Parties" and individually as a "Party." This Agreement is incorporated into the Manufacturing Agreement dated as of the same date hereof between the parties (the "**Manufacturing Agreement**"). Capitalized terms not defined herein have the meanings assigned to them in the Manufacturing Agreement. In the event a conflict between the terms of this Agreement and the terms of the Manufacturing Agreement, the terms of the Manufacturing Agreement shall be deemed to control.

This Agreement applies to the following Product(s) (the "**Products**") and model number(s):_____

_____, and other Products manufactured by Manufacturer for Buyer pursuant to the terms of the Manufacturing Agreement.

I.    Guiding Principles

   a.   Buyer and Manufacturer seek a service and returns process that is most efficient for the parties, maximizes the end-user's satisfaction, minimizes after-sale expenses for the parties and complies with all applicable laws, statutes and other governances in the territory of final consumer distribution.

   b.   The responsibility of the end-user's experience belongs to the Manufacturer. Products must be manufactured to assure end-user's expectations are met "out-of-the-box". Product's primary functions must be realized by the end-user through simply pressing the power button whenever possible. Product settings must be established at the factory to accommodate the end-user's expectation in the country of use. For example (as applicable):
   - All V-Chip settings must be unrestricted.
   - All product settings must be set for country of final distribution, such as DVD Region code and language settings.
   - All function buttons must be set to operate primary functions when power is supplied to the product.
   - All accessories packed so they are readily recognized by the end-user.
   - All Service Manuals and User Manuals must accurately explain the product, and provide information to service technicians and end-users in text that is clearly understood by the reader.

II.   Responsibility Dates

This Agreement applies to product servicing during the formal warranty period, and after the warranty period, in compliance with all applicable laws, statutes and other governances applicable in the territory of final distribution.

III.  Financial Responsibility and Process

Buyer and Manufacturer share in the responsibility for all after-sale (Service, Warranty, Returns) costs as detailed in the following paragraphs, except as set forth in Section III. (c).

a.  Buyer is responsible for:

- Retail product return costs. These costs include return product debits from retailers, return product consolidation fees, and shipping of returned products to Buyer's Product Return Center (PRC).
- Warranty service administration costs. These costs include services for contact center, service network, and parts distribution – as required.

b.  Manufacturer is responsible for:

- Return product administration costs ($2.00 per unit for DVD Players). These costs include receiving, scanning, recording, handling and warehousing of returns for outbound shipment. Rates for other products to be established through mutual agreement of the Parties. Manufacturer will pay invoices for product return administration costs within 30 days of receiving invoice from Buyer.
- Return product credit. Manufacturer will reimburse Buyer for the original buy price of each unit returned by the Buyer to the Manufacturer, for products returned during the warranty period.
- Accessory replacement costs. These costs include accessories requested by consumers during the warranty period. Manufacturer to supply free "seed stock" accessories at .2% of original order, and fulfill subsequent orders as submitted by the Buyer as warranty replacement stock is depleted. Remote controls are only accessories on the current product. Accessories for other products to be established through mutual agreement of the Parties.
- Warranty replacement product. These costs include replacement products requested by consumers for defective units. Manufacturer to supply free "seed stock" replacement units at 1% of original order, and fulfill subsequent orders as submitted by the Buyer as warranty replacement stock is depleted.

c.  Manufacturer is responsible for all costs related to catastrophic or repetitive failures, including safety recalls, and any other product recalls, regardless of Fault Found / No Fault Found. These costs include, but are not limited to, repair and replacement costs, all servicing costs, all administrative costs, and all testing and legal costs (including attorneys' fees) associated with such catastrophic failures or recalls.

IV.  Service Processes

Buyer will establish Product returns and service capabilities to assure retailers and end-users are appropriately serviced to the acceptable standards within the country of final Product distribution. The following will apply for end-user service:

a.  Buyer will establish a contact center to resolve the service issues to the best of their ability, and will transfer retailers or end-users to a product service/replacement option if issues cannot be resolved over the phone, via email, or via mail.

b.  Buyer will establish a Product servicing network ("Authorized Service Provider Network") to appropriately service end-users via centralized depot, carry-in service center, and in-home service. The selection of service type will be determined by Buyer, or the participating vendors in the Authorized Service Provider Network ("Authorized Service Providers"), based on the most cost-efficient method, in compliance with the



warranty provisions and established customer service standards within the country of final Product distribution.

c.  Buyer will establish a parts distribution network to assure Authorized Service Providers and end-users have a source to order and obtain required Product repair parts and accessories.

V.    <u>Retail returns process</u>

a.  Buyer will accept end-user returns based on the retailer's established returns and exchange policies, applicable warranty provisions and all applicable laws in the country of final Product distribution.

b.  Buyer's retail customers will ship returned Product to a Product Return Center ("PRC") established by the Buyer.

VI.   <u>Service and Parts Support Requirements</u>

a.  Parts Supply – Repairable Products

Manufacturer will provide (at its sole cost and expense) an adequate supply of repair parts and accessories for all repairable Products. Buyer, or its parts distributor, will maintain an inventory of repair parts to service the countries of final sale.

Manufacturer will make a supply of parts available to Buyer and/or Authorized Service Providers for a minimum of seven years after the final sale for Product covered under the Manufacturing Agreement.

Manufacturer will provide all parts and accessories to the Buyer for warranty repairs or replacements at no cost to the Buyer.

**<u>Manufacturer will accommodate repair part requests within the following guidelines, or shall be solely responsible for all costs incurred for Product servicing, Product replacement, or Product refund associated with the Manufacturer's failure to accommodate part requests:</u>**

<u>Initial Purchase Order:</u> All parts/accessories requested from Manufacturer shall be in the country of final distribution 30 days before the date the Product shipment leaves the Manufacturer's factory. Buyer will notify Manufacturer of requested parts/accessories at least 30 days before the parts/accessories are required in the country of final distribution, if Manufacturer supplies Parts Listing, Parts Pricing list and Service Manual to place the order. Failure of the Manufacturer to provide these required documents does not absolve Manufacturer from their responsibility to supply parts within the timeframe noted above. All costs for parts/accessories inventories, ordered by the Buyer from the Manufacturer, are the responsibility of the Manufacturer for warranty repairs.

<u>Subsequent Warranty Orders:</u> All parts/accessories ordered by Buyer must be delivered within 30 days of the part order to the Manufacturer.

<u>Out of Warranty Orders:</u> After the Term, all parts/accessories ordered by Buyer must be delivered within 30 days of the part order being received by the Manufacturer. All

parts/accessory inventory costs are the responsibility of Buyer for non-warranty parts orders. Part/Accessory Purchase Order (PO) terms for out of warranty Products will be negotiated separately from Product Purchase Order terms, but if no such terms are given, the terms of Product Purchase Order shall be deemed to control.

Part Packaging: All part/accessory orders may be fulfilled and packed separate from Product orders to accommodate delivery timelines noted above. Individual parts are to be appropriately packaged and labeled to meet part distribution needs in the country of final distribution. Buyer shall include appropriate packaging directions to Manufacturer on Parts Purchaser Orders. Manufacturer shall include appropriate instructions and manuals with all Part shipments.

b.   Service Information

Manufacturer will supply Buyer with the following information at least 45 days before an initial shipment of new Product is sent to Buyer or its customers:

- User Manual
- Service / Technical Manual (Serviceable Products)
- Product Bill of Material / Parts List
- Parts Price Listing (Serviceable Products)

**If the above materials are not received by Buyer as outlined above, Manufacturer assumes all costs for replacement Products due to failure of Buyer to provide Retail Customers with required information, and shall give Buyer the right to terminate all open Purchase Orders.**

Manufacturer will notify Buyer of any engineering changes, changes to design, changes to the Product build, or any other changes to the original Product before the changes are implemented in production. The Manufacturer and Buyer must agree on the changes in writing before any changes are implemented.

**Buyer will not be responsible for acceptance of any Product that contains any change that was not approved by Buyer in writing before manufacture. Manufacturer will be responsible for all administrative costs, additional repair costs, and product return costs associated with Buyer's failure to supply appropriate repair parts based on the failure of Manufacturer to advise Buyer of changes in production build/design/packaging. Agreement will be documented via signed Engineering Change Notice (ECN) by the parties.**

Manufacturer will coordinate with the Buyer to change the "model version" on the serial number whenever the Manufacturer and Buyer agree to a change in the Product build.

After approval of the new Product build by Buyer, Manufacturer shall provide Buyer with updated Service/Technical Manual, training and updated parts listing, and any other information required by Buyer to properly service the new Product build at least 20 days before the initial shipment of the new Product build to Buyer.

c.   Serial Number Configuration

Manufacturer will apply the following serial number configuration to all Products produced for Buyer:

17 digit serial number: Example - A050001007XXXXXXX

- A  = month of production (A=January, B=February, ...)
- 05 = year of production
- 00 = model version
- 01 = factory code
- 007 = product code
- XXXXXXX = sequential 7 digit serial number

All serial number configurations will be assigned by Buyer.  All Product build/design/configuration changes must be reviewed with Buyer before production to determine possible "model version" changes.

**Buyer will not be responsible for acceptance of, or payment for, any Product that contains serial numbers not approved by Buyer.**

VII.    <u>Revisions</u>

Changes or revisions to this Agreement can be made at any time during the Agreement upon written mutual consent of the Parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

*Buyer:*

PETTERS CONSUMER BRANDS, LLC

By:_____
Name: GEOFFREY A POLCAK
Its: S. VP- Operations

*Manufacturer:*

STARLITE CONSUMER ELECTRONICS
(USA) INC.
By:_____
Name: PHILIP LAU
Its:_____

1

## PROOF OF SERVICE BY MAIL

2

3      I am a citizen of the United States and employed in San Diego County, California. I am

over the age of eighteen years and not a party to the within-entitled action. My business address

4

is 12265 El Camino Real, Suite 200, San Diego, California 92130. I am readily familiar with

5

this firm's practice for collection and processing of correspondence for mailing with the United

6

States Postal Service. On November 7, 2007, I placed with this firm at the above address for

7

deposit with the United States Postal Service a true and correct copy of the within document(s):

8

**DECLARATION OF CHRISTINA D. COATES IN SUPPORT OF**
9      **DEFENDANT'S MOTION FOR AN ORDER COMPELLING**
**ARBITRATION AND EXHIBITS THERETO**

10

in a sealed envelope, postage fully paid, addressed as follows:

11

12      Anton N. Handal, Esq.
Pamela C. Chalk, Esq.
13      Gabriel G. Hedrrick, Esq.
HANDAL & ASSOCIATES
14      1200 Third Avenue, Suite 1321
San Diego, CA 92101
15      Telephone: (619) 544-6400

16

17      Attorneys for Plaintiff STARLIGHT CONSUMER
ELECTRONICS (USA), INC.

18      Following ordinary business practices, the envelope was sealed and placed for collection

19      and mailing on this date, and would, in the ordinary course of business, be deposited with the

20      United States Postal Service on this date.

21      I declare that I am employed in the office of a member of the bar of this court at whose

22      direction the service was made.

23      Executed on November 7, 2007, at San Diego, California.

24

25      _____

26                  Yvonne C. Kametani

27

28